## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALEXANDER K.,**[1] | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | **No. 20 C 5819** |
| | **)** | |
| **v.** | **)** | **Magistrate Judge Jeffrey Cole** |
| | **)** | |
| **KILOLO KIJAKAZI,** | **)** | |
| **Acting Commissioner of Social Security,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, over four years ago in February of 2017. (Administrative Record (R.) 497-98).[2] He claimed that he had been disabled since January 1, 2014, due to tendonitis, anemia, kidney failure, thrombocytopenia, enephalophy, delirium, anxiety and depression, and levoscolosis. (R. 497, 522). Over the next three and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. It is the ALJ's decision that is to be reviewed without deferring to the district court's

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

[2] At one point in the plaintiff's administrative hearing, the ALJ suggests that plaintiff also applied for Supplemental Security Income ("SSI") (R.354), but there appears to be no application in the record and plaintiff indicated he would not be seeking SSI when he filed his Disability Insurance Application. (R. 497). If that were the case, it would have significantly undermined plaintiff's claim – and limited the relevant evidence – as plaintiff would have had to have established he became disabled before the expiration of his insured status in June 2016. (R. 505). But neither the Commissioner's attorney, nor the plaintiff, addresses this question.

assessment. *Jeske v. Saul*, 955 F.3d 583, 587 (7ᵗʰ Cir. 2020). Acting *pro se*, plaintiff filed suit under 42 U.S.C. § 405(g) on September 30, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on October 20, 2020. [Dkt. #9]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

### A.

Plaintiff was born on February 15, 1973, and so he was just 40 years old at the time he claims he was never able to work again. (R. 497). He is divorced and living with his mother. (R. 306). He testified that his mother supported him and that he received food stamps. (R. 359).[3] Plaintiff has a bachelor's degree in accounting – he formerly worked as a financial analyst/consultant for about six years – and a culinary arts degree. (R. 364, 523, 543, 548). Plaintiff left the financial analyst job to start his own company, but that didn't workout. (R. 363). His most recent work experience has been as a chef. (R. 359-361). He left his last chef job because he couldn't manage the lifting – up to 50 pounds – anymore. (R. 360).

Plaintiff was drinking heavily during his financial analyst job. (R. 313, 335). Now, plaintiff testified, he had a drink here and there. He said he had been to one detox program in the past, but never went to AA. (R. 310-11). His medication – Effexor – was keeping him on a "more even keel." (R. 312).

The record in this case is massive. The medical evidence covers almost three thousand pages. (R. 668-3414). As per usual, very little of that appears to be pertinent to the issue of whether

---

[3] That conflicts with the sworn statement he filed to proceed in this case *in forma pauperis*, in which he attested that he received no public assistance and no gifts. [Dkt. #4, Par. 3]. Plaintiff also failed to answer question 1 regarding his pay at his last job. [Dkt. #4, Par. 3]. Judge Durkin afforded plaintiff the benefit of the doubt and accepted the application as filed. [Dkt. #7].

the plaintiff can work, or cannot. That the ALJ sifted through the haystack and came out on the other side with a few relevant needles and a cogent decision is admirable.

Review of the case is further complicated by plaintiff's decision to proceed *pro se*. Plaintiff testified that he read "every single one of" the medical exhibits (R. 305). But, he mentions only a couple of pieces of evidence he feels are important to his case, and does so in his Complaint. He says that he had balance issues that necessitated the use of a walker for time, and that these were addressed by surgery. He said he had surgery on his hand on April 9, 2019, and again after the ALJ's decision on January 30, 2020. He also indicates that a letter from his nurse practitioner and treatment notes from his treating psychiatrist are significant. [Dkt. #1, at 4]. Despite plaintiff's professed familiarity with the record, he provides no citations to this evidence and does not explain how whatever might be discussed in these pieces of evidence proves he is unable to work.

Plaintiff was instructed, more than once, that he was expected or at least permitted to file an opening brief and a reply brief. [Dkt. ##14, 20, 2]. Neither of the two "briefs" plaintiff filed direct the court to any evidence that supports his claim for disability benefits. Neither even mentions any of his impairments or how they prevent him form working. There will be more on that later.

**B.**

The claimant has a history of right shoulder surgery. On January 14, 2014, he underwent right shoulder arthroscopy, subacromial decompression, extensive debridement (R. 733). The postoperative records indicate that the surgery was largely effective. Just three days after surgery, on January 17, 2014, the claimant was "doing very well postoperatively. Pain is currently 0/10. Currently has no complaints" (R. 717). One month after surgery, the claimant continued to show significant progress. On February 14, 2014, examination revealed full range of motion in the

shoulder and equal and symmetric 5/5 strength. (R. 715). Plaintiff reported that he had "been in physical therapy for the last 2 weeks now going twice a week. He is very happy with his progress. He notes full range of motion, no pain in his right shoulder, and he notes improvement in his muscle strength in his right upper extremity" (R. 715).

In 2016, the claimant started to use a walker because of gait/balance difficulties, which appear to be related to his alcohol abuse, though the claimant attributes them to hip and cervical spine issues. However, neurological examination in May 2017 was normal, with the claimant demonstrating normal gait without ataxia or antalgia, 5/5 strength in all muscle groups of the upper extremities, intact sensation to light touch in the C5-T1 distributions, and full ranges of motion in both the cervical spine and the lumbar spine. The examining neurologist reviewed cervical and thoracic MRI, showing evidence of age-appropriate spondylotic changes and mild cervical stenosis throughout the cervical and thoracic region, but no evidence of acute pathology or of clinically significant stenosis (R. 2548-49).

As for plaintiff's gait issues, at least one doctor has summed it up by saying his exams have been "really under whelming." (R. 2554). On June 7, 2017, MRI of the right hip showed an acetabular labral detachment, without full-thickness articular cartilage defect (R. 2561). On August 28, 2017, the claimant had surgery on the right hip, an arthrosopy with labral repair, acetabuloplasty, iliotibial band windowing and trochanteric bursectomy (R. 2615-16). The surgery appears to have been successful. By February 22, 2018, six months after the procedure, the claimant had an essentially normal exam, with 5/5 strength and negative straight leg raise, and he reported being happy overall with the progression of his therapy and that he had stopped using his crutches (R. 2664-66).

4

In April 2018, the claimant reported a flare up of neck symptoms going back a month, after he had been "doing okay for the last year" (R. 2669).  An MRI at that time showed multilevel degenerative changes with mild deformity of the spinal cord at C5-6 and minimal deformity of the spinal cord at C4-5 (R. 3368).  On November 20, 2018, he underwent C5-6 anterior cervical discectomy and fusion.  By December 31, 2018, the plaintiff was walking approximately two miles a day for exercise. (R. 3120). He reported that  he had no shoulder or arm pain.  (R. 3120).  The orthopedic surgeon noted, "He is doing well at this point in time . . . He can start to ease himself back into physical activity, and at this point in time he has no restrictions. (R. 3121).  Six months after the cervical surgery, on May 6, 2019, plaintiff reported that "his neck has never felt better" and exam showed full range of motion. (R. 3347).

As to his right wrist issues, in April 2018, the claimant had an MRI of the right wrist, which showed triangular fibrocartilage complex (TFCC) tear as well an ultrasound that showed very mild tendinosis and a suspected small tendon tear (R. 3286, 3366).  He underwent arthroscopic repair for the TFCC tear in June 2018, which helped the radial part of his hand pain, but he continued to have significant ulnar-sided wrist and hand pain (R. 3328).

In July 2018, nurse practitioner, Mary Gondek, wrote a brief note indicating that plaintiff had "multiple health issues that interfere with his ability to work." She specified cervical spinal stenosis and a bulging disc at C6 that could not be corrected surgically, and degenerative arthritiof the right wrist which would prevent "full use of his hand."  The nurse also felt that plaintiff could not sit or stand for "longer lengths of time.'  (R. 2792).

Right wrist MRI and ultrasound in December 2018 revealed mild tendinosis with a suspect small tear and mild tenosynovitis.  (R. 3112-13).  Plaintiff had a cortisone injection that helped his

pain substantially.  (R. 3117). The claimant thereafter underwent surgery to repair the ulnar wrist

tendon on April 9, 2019.  By May 31, 2019, he reported 50 percent improvement, overall improved

mobility, ability to make a fist, and pain at only 2/10. (R. 3364).  He was discharged from physical

therapy after nine visits and having met all goals. (R. 3389).  By July 23, 2019, the claimant reported

80 percent to 85-90 percent improvement, with range of motion back to full.  His  grip strength is

improved, and he was able to type and do dishes and write and do chores around the house.  (R.

3393).   At that time, he rated his pain level as 1 out of 10 and stated he was "happy with his

progress so far." (R. 3393).  On September 12, 2019, plaintiff had a cortisone injection, which helped

considerably; he no longer had finger pain and was using the hand normally and has better strength,"

though he continued to have pain over the ulnar side of the wrist (R. 3413).

As for plaintiff's psychological impairments, the medical expert sifted through the record and

provided a summary and the supplemental administrative hearing.  She noted that the record showed

diagnoses of generalized anxiety disorder, and an adjustment disorder with depressed mood, as well

as diagnosis of an alcohol use disorder.  Plaintiff, then drinking daily, was in the detoxification

program at Lakeshore Medical in June 2015.  Treatment notes indicated his mood was mildly

dysphoric but he was not significantly depressed.  The diagnosis  was an alcohol use disorder.

Records covering the period from 2014 into 2018, in the main, indicated negative results in

depression and anxiety screens; mental status was, typically, reported as intact. In December 2015,

while diagnosis was generalized anxiety disorder and depressive disorder unspecified, exam agin

showed  normal memory, normal attention span, and intact concentration.

In records from October 2016, plaintiff's alcohol abuse comes up again but, again, mental

status exams were normal – normal mood and affect, his manner was calm and cooperative; he was

not confused and was not disoriented. There were additional alcoholism admissions July 10, 2016 to July 13, 2016, and July 30, 2016 to August 1, 2016, with delirium tremens, withdrawals, and some hallucinations. Still, in terms of mental status, the only abnormality noted at that time was very poor insight and judgment, related to the alcohol use. By January 2017, plaintiff was noted to be drinking three to four times a week, his depression was stable. (R. 321-26).

Plaintiff was seen in July and August of 2018, and again mental status exams show negative for depression, suicidal ideations, hallucinations, memory loss, normal mood and affect, judgment and thought content all unremarkable (R. 812, 815, 818).

Treatment notes from plaintiff treating psychiatrist, Dr. Clarey, covering visits from 2015 through 2019 follow the same trend. Dr. Clarey's exams were essentially normal, with only a couple of exceptions here and there. Over and over again, the doctor reported: speech normal, affect expressive, thought content normal, insight and judgment fair, cognition and memory intact, memory and attention intact. (R. 2783, 2785, 2788, 3062, 3064, 3067, 3069, 3071, 3073, 3075, 3077, 3079, 3081, 3083, 3086, 3089, 3092, 3095, 3098).

Plaintiff had a psychological consultative examination in connection with his application for benefits in October 2018 with psychologist, Christine Keiffer. He lied about his history of alcohol abuse. (R. 2831). He claimed he spent most of his time in bed and said it had been very painful to get up, dressed, and take the bus to the appointment. He also lied about having had psychiatric treatment in the past and his then-current treatment with Dr. Clarey. (R. 2832). Mental status exam was entirely within normal limits. Thinking was logical, coherent, fully oriented, socially appropriate, cooperative, responsive, memory was intact, he was able to do serial 7s, fund of knowledge was good, he was able to recount recent events, calculations were good, good ability for

abstraction, judgment was felt to be variable, and diagnosis was adjustment disorder with anxiety and depressed mood, consistent with other evidence in the file. (R. 2832). Dr. Keiffer diagnosed adjustment disorder with anxiety and depressed mood. She provided a mental residual functional capacity assessment, indicating no limitations in any work-related aspect of mental functioning. (R. 2834-38).

## C.

After two administrative hearings at which plaintiff, represented by counsel, testified, along with a different vocational expert each time, the ALJ determined the plaintiff had the following severe impairments: "degenerative disc disease of the cervical spine, status-post discectomy and fusion; labrum tear of the right hip, status-post repair; status-post triangular fibrocartilage complex (TFCC) repair of the right wrist; tendinosis of the right wrist; alcohol use disorder, in partial remission; affective disorder; and anxiety disorder" (R. 281). The ALJ dismissed plaintiff's idiopathic thrombocytopenic purpura (ITP); obesity; hypertension; and asthma non-severe impairments that caused only transient and mild symptoms and limitations, and were well controlled with conservative treatment treated. (R. 282). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 1.02, major dysfunction in a joint, Listing 1.04, covering plaintiff's back impairment, IBS, and Listing 12.04, covering plaintiff's mental impairmets. (R. 282-83). In regard to those mental impairments, the ALJ found that plaintiff had a mild limitation in understanding, remembering or applying information, and moderate limitations in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing

8

oneself.  (R. 283).

The ALJ then determined that plaintiff had the capacity to perform light work with a number

of additional limitations:

> no climbing ladders, ropes or scaffolds; occasional climbing ramps and stairs; occasional balancing; frequent handling with the dominant upper extremity; avoid all exposure to use of dangerous moving machinery and unprotected heights; work limited to simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any, workplace changes; rare, if any interaction with the public of a brief and superficial nature; occasional interaction with coworkers, but no tandem tasks; and occasional supervision.

(R. 284).  The ALJ provided a thorough summary of the medical evidence pertaining first, to

plaintiff's physical impairments, and then to plaintiff's medical impairments. (R.285-90).  She also

reviewed the hearing testimony, from plaintiff, his mother, and the psychologist-medical expert, Dr.

Rozenfeld.

The ALJ explained that she did not find any 12-month period during which plaintiff would

have been unable to perform the exertional requirements of light work.  She noted that he had a good

response to each o]f the surgeries:

> Six months after his hip surgery, he had a normal physical exam and no longer required crutches.  Six weeks after her cervical surgery, the claimant was walking 2 miles for exercise and his orthopedic surgeon noted no restrictions.  After six months, he reported that his neck never felt better.

(R. 286).  The ALJ further explained her finding that plaintiff would be limited to light work with

the added postural limitations would accommodate plaintiff's history of cervical, hip surgeries,

shoulder, right hand/wrist surgeries, and mild obesity.  The ALJ then noted that, with regard to

manipulative limitations, the record failed to document any continuing shoulder limitation after his

shoulder surgery.  Following plaintiff's right hand surgeries, he had 80 percent to 85 percent

9

improvement. Plaintiff did have some mild continuing symptoms and so, the ALJ explained that she limited him to frequent handling – no more than two-thirds of a day – with his dominant upper extremity. (R. 286). Finally, due to the plaintiff's history of alcohol abuse and considering his history of surgeries and his nonsevere impairments, the ALJ explained that she found that he should avoid all exposure to use of dangerous moving machinery and unprotected heights. (R. 286).

As for the ALJ's psychological impairments, the ALJ relied heavily on the opinion of Dr. Rozenfeld, who concluded that plaintiff was able to handle a full range of tasks, as long as he was limited to a routine work setting; simple, routine, repetitive tasks; superficial public contact, occasional coworker contact with no joint or tandem tasks, and routine supervision. The ALJ found that Dr. Rozenfeld provided a thorough and thoughtful summary and evaluation of the evidence of record, and that her opinion was consistent with that evidence; as such, the ALJ gave it great weight. (R. 288-89).

The ALJ gave the opinions from the state agency reviewing physicians and psychologist that there was insufficient evidence from the alleged onset date to the date last insured little weight because the ALJ felt the evidence received at the hearing level provided sufficient evidence from which to evaluate the plaintiff's claim dating back to the alleged onset date. (R. 287, 290). The ALJ gave the opinion from plaintiff's nurse practitioner that his impairments would interfere with his ability to work little weight as she was not an acceptable medical source, and did not address the effect plaintiff's limitations had on his ability to perform the various work-related functions. (R. 287, 290). The ALJ also gave little weight to the opinion of Dr. Dhiman because he did not discuss a number of plaintiff's physical impairments or provide any specific limitations. (R. 287).

Next, the ALJ determined that the plaintiff was no longer able to perform his past work as

a financial consultant or cook because the requirements of those jobs exceeded plaintiff's residual functional capacity. (R. 291). Then, relying on the testimony of the vocational expert at the second hearing, the ALJ determined that the plaintiff could perform other work that exists in significant numbers in the national economy. Examples of such jobs were: general office clerk (DOT #239.567-010) with 37,000 light unskilled (SVP 2) jobs in the national economy; routing clerk (DOT 222.687-022) with 40,000 light unskilled (SVP 2) jobs in the national economy; library clerk (DOT 249.687-014) with 14,500 light unskilled jobs in the national economy; and courier/van driver (DOT 230.663-010) - 28,200 light unskilled jobs in the national economy. (R. 292) Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 292).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

11

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). But, in the Seventh Circuit, the ALJ also has, or at least until very recently, was thought by many to have – an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Jeske*, *supra,* 955 F.3d at 587; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010).[4]  It was thought that the court must be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agreed with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As the court phrased it in *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996): "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." But, at the same time, the Seventh Circuit has also called this requirement "lax."  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.

---

[4] The phrase "logical bridge" seems to have first appeared in *Thompson v. Clifford*, 408 F.2d 154, 167 (D.C. Cir. 1968), where Judge Spottswood Robinson said in an administrative case not involving Social Security that: " 'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." Judge Posner then used the phrase "logical bridge" in a Social Security case merely to require Administrative Law Judges to articulate the reasons for their decisions. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)*.* But, *Sarchet* did not heighten the burden of proof or inform ALJs in Social Security cases of rules that had to be followed or tests to be employed. *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to an ALJ's decision. Not surprisingly, the Seventh Circuit has described the "logical bridge" requirement, even as strictly understood, as "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008).

2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

The "logical bridge" requirement even in its strictest form is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf. A simple trestle will suffice so long as it allows the reviewing court to traverse the divide between the evidence and the conclusions. *Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). That is at least how things stood until the Order by Judges Sykes, Easterbrook and Scudder in *Brumaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

There, the plaintiff argued that the ALJ failed to build a "logical bridge" from the evidence to his determination that the plaintiff is capable of light work. The plaintiff contended that the ALJ should have explained what changed after the first ALJ's conclusion that she could only do sedentary work, and since she did not, the "logical bridge" requirement had not been satisfied – and reversal was therefore mandatory. The Court of Appeals, citing *Biestek*, 139 S.Ct. 1152, unhesitatingly rejected this contention, saying: "[t]his argument rests on a *faulty premise*: the 'logical bridge' language in our caselaw *is descriptive but does not alter the applicable substantial-evidence standard*." 850 F.App'x at 977 (Emphasis supplied). Since the ALJ's decision was supported by substantial evidence, the Court of Appeals affirmed.

The ALJ's explanations in this case more than satisfies the obligations imposed on the ALJ whether under the original version of the "logical bridge" requirement or under *Brumbaugh's* analysis of the doctrine and its rejection of the notion that perhaps more than substantial evidence may be required to warrant an affirmance of an ALJ's decision in a Social Security case.

13

### III.

### A.

Throughout the application and hearing process, plaintiff chose to proceed without benefit of counsel, and provided an informed waiver, both orally, following a detailed explanation of the right to counsel and how the contingency fee arrangement worked, and in writing. (R. 350-51, 469). That choice, which was knowing and voluntary, was the plaintiff's and must be respected. *See Williams v. Saul*, 782 F. App'x 488, 491–92 (7th Cir. 2019)(valid waiver where ALJ explained right and fee structure, and plaintiff signed waiver form); *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019)(valid waiver where plaintiff received packet, signed form, and was informed of his right at hearing). Plaintiff chose to continue with that strategy once he filed suit in federal court. [Dkt. #3]. As it has transpired, the strategy was perhaps ill-conceived. That decision must be respected.

Plaintiff – a college graduate and former financial analyst – did not comprehend that the administrative record in his case, which was filed February 10, 2021, served as the Commissioner's Answer [Dkt. #19] and that it was far more involved – over 3400 pages long – than merely the transcripts of the two administrative hearings his application entailed. [Dkt. #18, 20]. Even after this was explained in a minute order, plaintiff still maintained that the Commissioner had never filed his Answer. [Dkt. #28].

Although plaintiff was instructed twice that it was up to him to file an opening brief in support of his argument that the Commissioner's denial of his application for disability benefits should be overturned [Dkt. ##14, 20], he failed to do so. Or, more accurately, all he filed was a one-sentence statement: "Plaintiff, Alexander Michael Kailing III (the "Plaintiff"), contends that the Defendant, (Andrew Saul, "Defendant") has provided a valid response to the initial complaint. As

such Plaintiff requests that the case be remanded to the Judge for consideration." [Dkt. ##21]. Obviously, that is no basis for a remand. But, even if the plaintiff meant that the Defendant had *not* provided a valid response to his initial complaint, that was clearly wrong, as already indicated, and also no basis for a remand. Plaintiff's reply brief was no better, arguing again that the Commissioner never filed an Answer and that the extension should not have been granted because plaintiff already had a CD-Rom of the record. [Dkt. #28]. But the Commissioner's motion for an extension adequately detailed how much more was involved in compiling and filing the entire transcript, especially during a pandemic. [Dkt. ##15]. Again, there was nothing to suggest a reason for a remand of the Commissioner's decision.

     As the Commissioner pointed out in his fully-supported response brief, even a *pro se* litigant like the plaintiff is required to "present a cogent legal argument with citations to authority and relevant parts of the record." *Greenwell v. Saul*, 811 F. App'x 368, 370 (7th Cir. 2020), *reh'g denied* (July 14, 2020). *See also Jackson v. Astrue*, 472 F. App'x 421, 422 (7th Cir. 2012). It is well-settled law that "perfunctory and undeveloped arguments, and arguments unsupported by legal authority, are waived." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). *See also Vang v. Saul*, 805 F. App'x 398, 403 (7th Cir. 2020); *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019). While it would be appropriate, given the foregoing caselaw, to consider plaintiff to have waived his challenges to the ALJ's decision, as noted earlier, in his Complaint, the plaintiff has pointed out a handful of things that he feels the ALJ missed or required a remand of his case. Following the Seventh Circuit admonitions to construe *pro se* filings liberally, the court will address those arguments – unsupported as they are by case law or citation to the record– to the extent possible. The court acknowledges that the leniency required to be granted to *pro se* litigants can put the other side at a disadvantage.

*See, e.g.*, Michael Fridkin and Rachel Brady, Playing on an Uneven Field: Litigating Against a Pro Se Opponent, The Circuit Rider 17 (May 2015).

First among these is plaintiff's use of a walker at one time due to balance issues. As the plaintiff puts it:

> [The ALJ] noted that I used a walker for falling due to alcohol use. The record should note that It was later determined that I had a laberal tear in my right hip and a c5-6 dis[c] compression that were causing my falls. The balance issues I had were a result of the compression in my spine and putting pressure on the nerves which caused balance issues. At the time I was also experiencing loss of vision in my right eye as a result of the compression. These issues were subsequently addressed by surgeries in the following years.

[Dkt. #1, at 4]. Plaintiff doesn't explain what mistake the ALJ might have made regarding this point, and because, as he says, the issues were taken care of with surgery, there is no indication they preclude plaintiff from working or ever did so for twelve consecutive months. As the ALJ adequately explained, plaintiff:

> used a walker for a period in 2016-2017 that appears to be associated with his alcohol use. There does not appear to be any 12-month period during which he required use of a walker that can be attributable to major dysfunction in a joint. He did have a right hip labral tear for which he had surgery. The surgery was effective, and he returned to full weightbearing within 12 months of the surgery.
>
>            *      *       *
>
> He used a walker for 6 months after the surgery. He did acknowledge that his hip is much better after surgery for a torn labrum.

(R. 282, 284-85).

As such, the ALJ addressed the evidence plaintiff points to and explained how it fit into his decision. Whether plaintiff was medically required to use the walker or not, he did not use it for twelve months in a row. In order to qualify for disability benefits, a plaintiff has to prove that his disability "lasted or [can] be expected to last for a continuous period of not less than 12 months" 42 U.S.C.A. § 423(d)(1)(A). *See also Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021)("'To be

considered disabled, [plaintiff] had to prove []she was unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last at least 12 straight months."); *Walker v. Bowen*, 834 F.2d 635, 636 (7th Cir. 1987)("To be eligible for [disability] benefits, the [plaintiff] must show that he has been totally disabled for at least twelve consecutive months.").

Plaintiff next complains that the ALJ failed to "mention the procedure [he] had on April 9, 20l9 at Northwestern whereby another procedure was performed on [his] hand in an attempt to increase blood flow to the tendon in the hand and the subsequent occupational therapy and that this was not successful." [Dkt. #1, at 4]. First, the plaintiff is simply wrong that the ALJ did not mention the April 2019 surgery. She did, and discussed it at length in her consideration of the medical evidence, which indicated that plaintiff got excellent results from the procedure:

> The claimant thereafter underwent surgery to repair the ulnar wrist tendon on April 9, 2019. By May 31, 2019, he reported 50 percent improvement with ability to make a fist and overall improved mobility (B35F/135). He was discharged from physical therapy after nine visits and having met all goals (B35F/160-162). By July 23, 2019, the claimant reported 80 percent to 85 percent improvement, stating that he "Feels range of motion is back to full, grip strength is improved, able to type and do dishes and write and do chores around the house." At that time, he rated his pain level as 1 out of 10 and stated he was "happy with his progress so far" (B35F/165)

(R. 286). Over a year later, plaintiff did begin to experience some pain in the wrist and got a cortisone injection. The ALJ mentioned this as well. And, it must be remembered that the ALJ did not find that plaintiff had no limitations in the use of his right hand. Instead, the ALJ found he was restricted to handling objects no more than two thirds of the day. (R. 284).

Plaintiff then complains that ALJ failed to mention another surgery he had on his hand in January 31, 2020. [Dkt. #1, at 4]. But, obviously, the ALJ cannot be expected to address evidence that comes into being *after* she has rendered her decision or make a plaintiff's future planned

medical procedures part of that decision. While plaintiff did submit evidence of the surgery to the Appeals Council in February of 2020 (R. 151-211), that's all it is: evidence of the surgery. It's up to the plaintiff to prove, with medical evidence, that he is unable to work. *Gedatus*, 994 F.3d at 905; *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987)("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). Surgeries or diagnoses, without more, are not disabilities. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). There is no evidence regarding limitations following the surgery or any lasting effect – again, a disability has to last at least twelve months – on his ability to work. All we know from that evidence is that plaintiff "tolerated the procedure well. Blood loss was minimal. There were no intraoperative complications. Total tourniquet time was 32 minutes. Fingers pinked up immediately at the end of the case." (R. 175).

And, again, contrary to the plaintiff's reading of the record, the Appeals Council did address this evidence in their denial of review. (R. 2). They explained that it was from outside the relevant period of review, and advised plaintiff that he would have to apply again if he wanted to claim disability for a period beginning in 2020. (R. 2). *See also Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989)(". . . reports postdating the hearing speak only to [plaintiff's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration.").[5]

---

[5] While plaintiff does not raise any new and material evidence argument, the surgery report would not qualify as "new and material" because there is not a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered, and it is not relevant to the claimant's condition
(continued...)

Plaintiff next argues that it was inappropriate for the ALJ to "give[] no weight to the note from [his] nurse practitioner, who has managed [his] care for many years . . . ." [Dkt. #1, at 4].  But, as the plaintiff concedes, a nurse practitioner is not an acceptable medical source under the regulations applicable to plaintiff's claim.  *Brumbaugh v. Saul*, 2021 WL 1100562, at *3 (7th Cir. 2021); *Sosh v. Saul*, 818 F. App'x 542, 547 (7th Cir. 2020).  Even so, the ALJ went beyond merely dismissing the note (R. 2792) as not being from an acceptable medical source.  She said that the nurse did not provide a function-by-function assessment, and stated only that plaintiff's multiple impairments "interfere with his ability to work."  Similarly, the nurse wrote that plaintiff had difficulty sitting or standing for "longer lengths" of time but, as the ALJ noted, did not define what a "longer" length of time might be.  (R. 287).  Clearly, the ALJ's explanation for her rejection of Nurse Gondek's opinion more than satisfies either *Sarchet* – if still applicable – or the most recent pronouncement in *Brumbaugh*, *supra*.  *See also Sosh*, 818 F. App'x at 547; *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008).

Along these same lines, plaintiff takes the ALJ to task for according great weight to the medical expert's opinion and assessment of the medical evidence regarding plaintiff's psychological impairments, but failing to mention records of treatment from plaintiff's treating psychiatrist, Dr. Clarey – who ironically, is the psychiatrist plaintiff denied seeing at his consultative exam.  Actually, the ALJ addressed and considered the evidence from Dr. Clarey through Dr. Rozenfeld summary and review of it at the hearing. (R. 288, 289, 2782-2791, 3061-3100 ).  Regardless, Dr. Clarey's exams were essentially normal: speech normal, affect expressive, thought content normal, insight

---

[5](...continued)
"during the relevant time period encompassed by the disability application under review." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005)

and judgment fair, cognition and memory intact, memory and attention intact. (R. 2783, 2785, 2788, 3062, 3064, 3067, 3069, 3071, 3073, 3075, 3077, 3079, 3081, 3083, 3086, 3089, 3092, 3095, 3098). When treatment note after treatment note reports normal findings, that is substantial evidence to support an ALJ's conclusion that a plaintiff's mental limitations do not prevent him from working. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 782 (7th Cir. 2021); *Kuykendoll v. Saul*, 801 F. App'x 433, 437 (7th Cir. 2020).

The plaintiff also takes issue with the vocational expert's opinion that he could perform the jobs of a library clerk or courier/vandriver because he claims to be unable to be in a seated position for extended periods of time or do any lifting. [Dkt. # 1, at 4]. But, the plaintiff is confusing his allegations with the medical evidence. A plaintiff's allegations about his pain and limitations, alone, are not conclusive. *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020); 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability ...."); 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled.").

As the medical record reveals, surgeries, when necessary, provided good results and physical exams were mostly normal in terms of strength, range of motion, etc. An ALJ may not ignore a plaintiff's subjective reports of pain or mental impairments – and the ALJ did not do so here – "but discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Seamon v. Astrue*, 364 F. App'x 243, 250 (7th Cir. 2010). *See also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005).

That being said, one of the jobs the ALJ concluded plaintiff would be able to do gives pause: van driver courier. The ALJ explained one portion of her RFC finding by saying that "[b]ecause of

the [plaintiff's] *history of alcohol abuse* and considering his history of surgeries and his nonsevere impairments, I have found that he should avoid all exposure to use of dangerous moving machinery and unprotected heights." (R. 287 (emphasis added)). Obviously, given that finding and reasoning, the van driver job makes no sense. Because there are three other jobs that plaintiff can do however, the error here is harmless, and no remand is necessary.

Finally, the plaintiff wants a remand so that the ALJ can consider whether he was disabled for a twelve-month period figuring the time from the onset of his symptoms through his surgeries and through the conclusion of physical therapy. [Dkt. #1, at 4]. As with all of his arguments, he fails to direct the court to any medical evidence indicating when the various symptoms began and, more importantly, when those symptoms became disabling. Even with a *pro se* litigant, the court is not required to sift through an immense record to "tease out" support for arguments. *Dickens v. Illinois*, 753 F. App'x 390, 392 (7th Cir. 2018); *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016)("While we liberally construe the pleadings of individuals who proceed pro se, 'neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for'" support for their claims); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010)(*pro se* litigant had to point to evidence in the record as it was not the "district court's job to sift through the record and make [plaintiff's] case for him."). Nevertheless, a bit of sifting has been fruitless.

For example, plaintiff had shoulder surgery on January 14, 2014. Three days after surgery, on January 17, 2014, he was doing well and had no pain. (R. 717). One month later, an examination revealed full range of motion in the shoulder and equal and symmetric 5/5 strength. (R. 715). As plaintiff alleges his symptoms became disabling on January 1, 2014, it's quite obvious that this example does not come close to adding up to twelve months.

21

As another example, plaintiff had his hip surgery on August 28, 2017. (R. 2615-16). Not even six months later, in February 2018, plaintiff's physical examination was normal: 5/5 strength and negative straight leg raise. (R. 2664-66). Prior to that, in May 2017, physical examination was also normal: normal gait without ataxia or antalgia, 5/5 strength in all muscle groups of the upper extremities. (R. 2548-49). Even making the grand assumption that plaintiff suddenly experienced disabling symptoms immediately after his May 2017 exam, again, it doesn't add up to twelve months.

In sum, the ALJ's decision is supported by substantial evidence. While there are certainly periods of increased symptoms and subsequent surgery and rehabilitation, these do not amount to a twelve month period of disability. In the main, physical exams revealed normal results or mild impairments. As one physician said, they have been "underwhelming. The very mental status exams that plaintiff points the court to in his Complaint are also all, in the main, normal. "To prevail, [plaintiff] had to persuade [the court] that the ALJ's decision was not supported by substantial evidence—that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greenwell v. Saul*, 811 F. App'x 368, 370 (7th Cir. 2020)(quoting *Biestek v. Berryhill*, ⸺ U.S. ⸺, 139 S. Ct. 1148, 1154 (2019)). *See also Brumbaugh v. Saul,* discussed *supra* at 13. Plaintiff has failed to do so and therefore the court has no cause to disturb the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment [Dkt. #24] is granted, and the ALJ's decision is affirmed.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 9/14/21

23